243947 Brian Pesta v. Cleveland State University et al. Oral argument not to exceed 15 minutes per side. Mr. Kelly III for the Plaintiff Appellant. Good morning. Good morning, Your Honors. Frederick C. Kelly on behalf of Appellant Brian Pesta. I'd like to reserve five minutes of time for rebuttal. Yes. May it please the Court. This is a First Amendment case of the importance. It involves Dr. Brian Pesta, a research psychologist of several decades standing at Cleveland State University. In 2019, Dr. Pesta published a landmark scientific study on race, intelligence, and genetics. Now the plain fact of the matter is that many fear the kind of research that Dr. Pesta undertakes. However, it is the function of free speech to free men from the bondage of rational fears. Even so, there are some who prefer to be bound. They don't just want to bind themselves. They don't rest content with that. They want to bind you and I and all the others. And for such people, the question becomes how to bind free speech. I mean, he did have some missteps that had nothing to do with free speech. Isn't that relevant in terms of how you're using the data and honesty there? That's actually incorrect, Judge Sutton. Okay, yeah. There was one slight misstep, a very de minimis misstep. There were no missteps on the purpose for which you use the data. And any notion that there is, is belied by the record. I don't understand why you get to create a dichotomy of purpose. I mean, that's a means-ends point. You know, the end was great, so the ends are justified. If it was a misstep, isn't that an explanation for discipline? No, no. Under the Academic Misconduct Code, that's not so, Your Honor. Under the Academic Misconduct Code, in order to find research misconduct, there has to be an intentional, knowing, or reckless misstep. One that really goes to plagiarism or falsification or fabrication of evidence. There were no such missteps here. The only misstep, the sole misstep here, was the use of the Dutch server. That's it. And that wasn't just a misstep on Dr. Pest's part. That was a misstep on the part of the NIH and CSU as well. And again, you face a potentially bewildering record here, studded with numerous facts and replete with references to apparently obscure regulations. But frankly, I think if you can follow me through just four documents, you can lay all these allegations of misconduct, more or less, to rest. Those four documents are as follows. One, the Burt et al. complaint at page 808 of the record. This is what is the spur to both CSU and the NIH. It said at some point in September 2019, the exact date was never determined in discovery. Two, the NIH's initial inquiry on September 19th, 2019, page 1544 of the record. Now they lay special emphasis there on the third request. Three, Dr. Pest's reply the very next day on September 20th, 2019. It takes the pages 1547 to 1551 of the record. Get those first three documents within your grasp. Then turn to the record, the timeline at page 925 of the record. At page 925 of the record, there are at least six reasons why the use of the Dutch server is not anything more than diminished. And those six reasons are September 23rd, 2019, December 13th, 2019, December 23rd, 2019, February 20th, 2020, June 24th, 2020, and August 12th, 2020. On each of those dates, after being alerted to the use of the Dutch server, either CSU or the NIH re-approved Pest's access to restricted access databases. And the September 23rd, 2019 date and the February 20th, 2020 date are especially relevant here. Because on those dates, after it was confirmed once again that Pest was using his database to study race and intelligence under the third request, CSU told Dr. Pest, I'm sorry, the NIH told Dr. Pest to keep going with the second request. It did it on September 23rd, 2019. And then on February 20th, 2020, they re-approved his access for the third request. Now, I respectfully submit, perhaps you'll tell me I'm wrong, it cannot be this is an honest mistake on the part of the NIH experts and CSU's Office of Research Integrity. Why didn't you sue NIH? Why didn't we sue NIH? Well, your honor, there's only so many people we can go after here, frankly. And it was really CSU that inflicted the most egregious injury here. The NIH may be a target down the line if they continue with their misdeeds. But right now, the question is CSU, which had an obligation to protect Dr. Pest's free speech and protect his rights to academic freedom. It was they who practically caused him harm. So that's why we sued CSU. Now, the Dutch server is the second allegation of misconduct, the second finding of misconduct. The first, however, was this crazy Soviet logic that he misused the second request by doing the research he was permitted to do under the third request. And that is simply absurd on its face. It was an issue that was never faced, I think, by by appellees. That's findings number one and two, gone. Findings three and four are waived completely, they were not addressed at all by appellees on this appeal. Finding number five was the conflict of interest statement or the conflict of interest finding. That too, I think, for the reasons I've set forth in my brief, is completely gone. With those allegations laid to rest, I respectfully submit that all the other allegations they've raised cannot possibly carry their burden under Mt. Healthy or under this court's decision in Donna Coppola's case, Coppola v. Shelley. And they can't say, gee whiz, this phantom violation of the consensus was the real issue, or not reporting the data, or storage on the home computer, or failing to properly monitor John First. They can't say these would be reasons for actually terminating PESTA, because they reviewed all of these in the course of their investigation. And not even people as infected with Animus as appellees Ward, Mallett, McLennan, and Regassi could find that these rose to the level of research misconduct. So with those notions buried in the research report, they can't resurrect them now when they need new reasons to try to say we're justified in terminating Dr. PESTA. I submit that those are kind of like bodies that are buried, and like any corpse that's been interred for a long time, they defy reanimation even on appeal. I'm happy to lead you through the record. It is rather confusing. But if you have no further questions for me... Save the rest of your time for rebuttal. That's fine. Thank you, Judge Sutton. Thank you. We'll hear from the other side. Thank you. Good morning. Good morning, Your Honors. May it please the Court, my name is Karen Giffen, and my co-counsel Karen Kaminsky and I represent the appellees in this case, a series of individuals who are employed by Cleveland State University. I want to first make clear that we do not believe that this is a case about the First Amendment. It's not about whether the First Amendment gives a right to publish in an academic setting on a controversial subject. It's about Dr. PESTA having engaged in serious research misconduct. I mean, I will tell you, it does make me nervous when I see someone getting disciplined and they happen to specialize in provocative scholarship in this day and age. Understood, Your Honor. And I think that that is a concern well taken. But in this case, the construction by Dr. PESTA of what this Court's decision in Merriweather, as you'll recall that case... That's a case that's very sensitive to this point. That's a case in which there was a teacher who ran afoul of the school's rule that you had to use certain pronouns in the classroom and it was about gender identity issues. And in that circumstance, the teacher was disciplined because he refused to comply with that rule. And it was deemed that that was protected First Amendment speech. However, Dr. PESTA's reading of Merriweather would result in this. If the teacher, while engaged in talking in the classroom about pronouns and gender identity, struck a student, there's a little bit of protected speech, but clear classroom misconduct for which the teacher should be disciplined. Or alternatively, you're making mention of in the classroom. I think he would say that's an unfair analogy. He would say the proper analogy is when you use incorrect pronouns, you have to file a report with the administration and didn't file the report in the right way and then was fired. But I'll address that. Because one of the things that has... And in fact, Mr. Kelly just repeated the allegation that somehow what Dr. PESTA did in this case were minor infractions of the NIH rules or CSU's rules. And there is no evidence in the record that these infractions were minor. The NIH has as part of its mission, of course, to protect sensitive data sets. And there is a very specific process that everyone who wants to get access to that controlled access data must employ. And all of these rules are designed to do a couple of things. Protect the data. And secondly, to make sure that NIH understands what is happening with the research material, what is happening with the data set and what are the purposes. That means you have to file applications where you clearly describe the nature of your research. That means you have to timely present reports about what you've done with it. Did you make any findings? Who was... I mean, the disclosure seems like the biggest issue. Who were the... Who had access? What's the extent of that breach? Meaning the non-disclosure? There's two aspects to the non-disclosure. And there's actually several pieces to it. The first is in the application, Dr. PESTA was required to describe what the particulars were of the nature of his misconduct or the nature of his research. And in so doing, he chose to not clearly describe what he was going to do with the data set, how he was going to use it. Then, after three separate requests for the data, the same set of data, the TCP data, none of which clearly described what he was going to do, the last obligation was then to make timely reports. In the meantime, after the third request was made for the TCP data, the Global Ancestry paper of which Mr. Kelly made reference was issued. At that point in time, he was required, when he renewed his request to keep the data, he was required to inform NIH of the existence of the paper. He chose not to do so. And in fact, the paper was submitted for publication in June of 2018. It was accepted for publication in August 28th of 2018. It was published on 2019, excuse me, on August... What if he just didn't trust NIH? Pardon me? Maybe he just didn't trust NIH. But that violates NIH's rules about what you have to do to get access to the data. NIH is certainly able to control how it is that you get access to this data. These are data sets that, in their creation, individual research subjects were told, this is what's going to happen to the data, this is how we're going to respect your confidentiality in the future, and that is why the NIH has a system of controlling how you get access to that data. In this circumstance, and one of the clear points is in the emails between Dr. Pesta and his co-authors that preceded the very first request for the data, they laid out how they were going to hide the information from the NIH. And the argument that I don't want to tell the NIH what I intend to do with the data set because I'm concerned that you are not an adequate explanation for failure to follow the rules and failure to... Is it quite likely that they would not have let him have access to the data if he'd been explicit about what he was going to do with it? No one has ever, including the NIH, has ever said, had you told us exactly what you were going to do, we would have denied it. No one has said that. And we don't know the answer. Then it's a harmless foul. Pardon me? Then it's a harmless foul. But how can it be harmless when the NIH... They're not saying they were going to not let you use it. Because they cannot let researchers willy-nilly ignore their rules and procedures for how they get the data and why they get the data. Why have the rules in the first place? If the NIH is not permitted to control the circumstances under which the data will be for review, the point that the NIH... Out of curiosity, I know that you're not NIH. Indeed. So don't worry about this if you can't answer it. But let's just say, is there a process? What happens if you say, here's how we're going to use it. It's provocative. This is clearly provocative. And you say, I realize this is provocative, but we think for whatever reason we think this is important to have. And the NIH says, no, we're not doing that. Is there a process for that?  Does that go to court? Does that eventually go administratively then to court? I don't know whether it goes to court, but certainly goes administratively. And I assume since you can clearly sue the NIH... You could bring a First Amendment. I'm certain that there is a process by which an individual researcher could challenge the NIH's decision with respect to that. But the fact that that process exists doesn't change the fact that you still must follow the rules. And in this circumstance, the threat to CSU as a research institution was very real. CSU spends $55 million on research every year. And this misconduct by Dr. Pesta challenged CSU's relationship with NIH and its reputation for research integrity as an institution. These are not minor offenses. And by the way, the only characterization of the offenses as minor comes from either Dr. Pesta or his counsel. There is no expert in the field who presented to the lower court or to this court an opinion that these were merely minor infractions. They really weren't meaningful. The only expert opinion that was presented to the lower court or to this court was Dr. Oaks, who is the Appellee's expert. And he is a subject matter expert with decades of experience doing this kind of research. And he clearly said these were not minor infractions. And of course, the NIH said so and meted out its most severe sanction that it had ever meted out for research misconduct of this type. So this is not a circumstance where we can just, on the basis of their minor, without any support in the record, to substantiate it. Given that... Universities are pretty sensitive to following the national rules these days, I've got to believe. Indeed. Indeed. The universities have become quite adept at trying to understand what the judge intimates there. The research dollars are extremely important to these universities. And failing to follow what the government says you need to do runs a real risk. So if we go back to this case and the question that the judge posed at the very beginning of what do we do in circumstances where somebody is teaching or doing scholarly work about a and yet they engage in misconduct, the answer to that question is found in all of the cases that cited in the briefing. The conclusion is first, the plaintiff has to establish that he was engaged in protected speech. The speech at issue for which he was disciplined was not the subject matter of his research, but how he dealt with the NIH and his failure to follow the rules of the NIH and CSU. That is not protected speech under the First Amendment for two reasons. First, because Dr. Pesto, when he was making those representations to the NIH, he was acting in an official capacity as a faculty member at CSU. In order to get access to the data, you have to be affiliated with an approved research institution. And he was in this circumstance. In fact, he was the only one of the co-authors who had that approval. The second reason why it's not protected is because the public doesn't have an interest in not being truthful to the NIH about what you intend to research or what you don't intend to research. So we'd argue that Garcetti and Meriwether in this circumstance operate to say that there is no First Amendment protection for what Dr. Pesto was disciplined for. Secondly, even assuming there is protected speech here, Dr. Pesto must show... Take me back to Garcetti. You're saying this is government speech? Pardon me? What do you mean when you say Garcetti, what do you mean by the government speech point? Play that out a little bit. The government speech point following the NIH rules? Is that what you mean by that? Exactly. The speech to the government is not a matter of public concern. I get the court's point and we agree that the subject matter of Dr. Pesto's research is a matter that under ordinary circumstances would be protected by the First Amendment. But that is only relevant if the reason why he was terminated, if the reason for the adverse action was because of the nature of that protected speech as opposed to the misconduct. And all of the evidence below shows that the basis for the termination was the misconduct and not the subject matter of the research. And Dr. Pesto has failed in his burden, and it is his burden to show that causal nexus between what he claims to be protected speech and the adverse consequence. And then the last point that I'll make is even under Meriwether, all of the cases where there is evidence that the adverse employment action would have happened without regard to whether the protected speech had happened or not, then the government employer in those circumstances will be found not to have violated the First Amendment rights of the plaintiff in those circumstances. All right. Thank you very much. Thank you. Mr. Kelly, you have this in the bottle. Thank you. Your Honor, only the most blinkered focus would say that the speech at issue here was Dr. Pesto's speech on the status access requests. You look at pages 3294 and 3295 of the record, which is an email amongst the investigative committee on November 11th, 2021. They are focused very clearly on the subject matter of Dr. Pesto's global ancestry paper. That was in their minds. You look at page 3296 of the record, there is an outtake from the draft, which the investigative committee opted not to include in the final report, where we are back 100 years, and they are worried about the bad tendency of speech. They are worried that Dr. Pesto's research agenda is harmful. They are worried that his findings have negative impacts on the community in general, as well as CSU specifically. And frankly, his research makes the investigative committee ashamed to be associated with CSU. Only the most blinkered focus would say that, gee whiz, they're really worried about this data access request. If they were really... Doesn't it make sense that in this day and age, universities have to follow these rules pretty carefully? I mean, it's not an abstract point. I mean, it's very easy to lose But if the rules are so obscure that the rule makers themselves and the experts in CSU's Office of Research Integrity can't follow them themselves, how is that research misconduct on the part of Dr. Pesto? It's not. It cannot be the case that they all missed the use of the Dutch server, and it's okay for them, it's okay for Dr. Ward and everyone else in the Office of Research Integrity, but it's a hanging offense to Dr. Pesto. That's impossible. If I give you conclusions which are completely divorced from the facts, I'm giving you something in bad faith. And there is no answer by the appellees as to why CSU nor the NEH ever found that Dr. Pesto's research under the third request was prohibited. But they never found that it was prohibited. And you go back again to those four documents I offered to you earlier. They knew what he was doing with the Dutch server, and they knew what the purpose of his research was beyond a shadow of a doubt on September 20th, 2019. Three days later, they re-approved him for access to the second request. Five months later, they re-approved his access to the third request. They knew what he was doing. It can't be that this research is kind of for Dr. Pesto, but it's okay for everyone else. And the most severe sanction meted out by the NEH, this is probably bogus too. But we don't know the truth about this because CSU did not follow their own policy. Instead of interviewing Dr. Lauer on the record at a point where Dr. Pesto could cross-examine him as to why he was in violation of his rules, instead CSU had a little sub-rose of conversation between their attorney, Jack Krasuski, and Dr. Lauer. A conversation that wasn't even put in the final report, and Dr. Pesto didn't know about it until it was time to get the provost letter of termination. You have violations. No one, no one countenances a dozen serious missteps in their own protocol for reviewing research misconduct and comes up with farceful findings that they can't defend here if they're behaving in good faith. But that's what happened here. Any other questions? I don't think so. Thank you very much to both of you for your helpful briefs and oral arguments and for answering our questions, which we always appreciate. I do want to say one thing. I've got a minute left. Oh, okay. I think I was a touch harsh with opposing counsel especially my reply brief. I did think the record had been misstated, but I think I could have brought that to the court's attention with a bit more courtesy than I did. And to that extent, I apologize to Ms. Giffen. She's been a wonderful adversary. Thank you for saying that and thank you for acknowledging that. Appreciate that very much. The case will be submitted.